Filed 11/26/14  P. v. Cano CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRIS A. CANO,<br><br>    Defendant and Appellant. | B255374<br><br>(Los Angeles County<br>Super. Ct. No. SA085405) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn Solorzano, Judge.  Affirmed.

        Tracy L. Emblem, under appointment by the Court of Appeal, for Defendant and Appellant.

        No appearance for Plaintiff and Respondent.

Defendant and appellant, Chris A. Cano, appeals from the judgment entered following a jury trial which resulted in his conviction of the felony of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] during which he inflicted great bodily injury upon the victim (§ 12022.7, subd.( a)) and misdemeanor battery (§ 242). The trial court sentenced Cano to seven years six months in prison. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

   a. *The prosecution's case*.

Margaret Rose McCarte and Martha Andreani attend St. Augustine Church on Jasmine Street in Culver City. The two women were at the church on the grounds near the church school on the evening of October 3, 2013 helping to set up for a fund raiser and festival which was to be held there that weekend. McCarte, Andreani and a number of other parishioners finished setting up at approximately 9:30 p.m. and began to walk to their cars, which were parked in a lot between the parish offices and the church. As she was walking past the parish center, Andreani heard someone yell, " 'Help.' " and " 'Call 911.' " When she looked toward the parish hall, Andreani saw "a man in a wheelchair and another man s[t]anding right next to him, and then another one [standing in the area] as well." The two men standing near the man in the wheelchair were on the "husky" side and wearing white T-shirts.

McCarte, who was walking with Andreani, also saw a man sitting in a wheel chair. She heard the man in the wheelchair begin to yell something and, as she got closer to him saw, in addition to the two men standing immediately next to him, a third man standing on the church steps. The man standing on the steps had a cut on his face. McCarte then realized the man in the wheelchair was yelling, " 'Help, help, help. We need help.' "

As McCarte and Andreani continued to walk toward the church, Andreani saw one of the two men standing right next to him take his left hand and do "a back slam on . . .

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

the face of the man in the wheelchair." At that point, Andreani turned around and walked to her car to get her cell phone.

In the meantime, McCarte saw the two men who had been standing just by the man in the wheelchair walk quickly across the parking area toward an exit. When she asked the men what was going on, one of them responded, " 'Those two guys over there are fighting.' " After one of the two men had answered McCarte's question, the men continued to walk at a brisk pace toward the exit and out onto the street. McCarte did not get a good look at either man. She had, however, assumed one of them was Hispanic "because of [his] accent when he answered [her] question."

As McCarte approached the man in the wheelchair, she saw that the man standing on the church steps "had his hands kind of up on his face and there was a lot of blood all over the place." By that time Andreani had retrieved her cell phone and called the police and an ambulance. One of the parish priests and his son who had come out of their offices were using paper towels to attempt to help the man stop the bleeding from his face. At the same time, the man in the wheelchair, who appeared extremely agitated, continued to yell. According to McCarte, he kept saying, " 'He's going to kill us. He's going to kill us. He's not going to stop until he kills us.' "

Police officers and an ambulance arrived and, after McCarte and the others had given them their statements and contact information, they left the area. On the way to her car, McCarte did not remember seeing "any weapons or knives."

Daniel Mendoza (Mendoza) stated he is homeless and sleeps at the church every night. The members of the church know that Mendoza and, at times his father, Louis Mendoza, who is also homeless, sleep there and they allow them to do so.

Both Mendoza and his father drink alcoholic beverages and, on October 3, 2013, they each had "a couple of [beers]." Although Mendoza had, for approximately the last five years, "h[u]ng out" with his father, at the time of trial he had not seen him for several weeks. Mendoza had been unable to try to call his father because his father's cell phone had been stolen and Mendoza had no idea where his father was. The last time he had

3

been with his father, they had gotten into an argument, however it was "not" "normal" for Mendoza to have not seen his father for so long.

Mendoza had met Cano "on the streets" approximately one year earlier. Cano, who lived with his brother and mother, had "hung out" with Mendoza and the two men occasionally shared a beer. On at least one other occasion Cano, who was unemployed, had asked Mendoza for money to buy beer. One time, when Mendoza told Cano he did not have any money, Cano hit Mendoza on his left cheek just under his eye. Mendoza had not hit Cano back. He had simply gathered up his things and walked away. Cano had followed Mendoza for a time, but Mendoza eventually "got away from him." On a later occasion, Mendoza had asked Cano for money and Cano had given it to him.

Mendoza had seen Cano carrying a knife a couple of times. Although on each occasion Cano had a different knife, both were "flip" knives and Cano had appeared to be "[j]ust messing around with [them]" Then, a couple of weeks before the October 3rd incident at the church, Mendoza had gone into a surplus store with Cano and watched as Cano bought a third knife.

At approximately 9:00 p.m. on October 3, 2013, Mendoza and his father, who had spent the day together, were crossing a street on their way to the St. Augustine Church when they passed Cano and Cano's friend, Rick. Rick asked Mendoza if Mendoza could get him some marijuana. Mendoza simply said "no" and kept walking.

When Mendoza and his father reached the church, they realized there were people still inside so Mendoza sat down on the steps and he and his father talked while they waited for everyone to leave. Approximately one hour later, Mendoza saw Cano and Rick walking toward him and his father through the church parking lot. While Rick stood behind Mendoza's father's wheelchair, Cano approached Mendoza, sat down next to him and said, " 'Give me 20 bucks.' " Mendoza, who was frightened because Cano had already hit him once, nevertheless told Cano he did not have any money. At that point Mendoza "felt the cut." Mendoza put his hand up to the left side of his face, then quickly stood up and backed away from Cano, afraid Cano would cut him again. He then saw "blood . . . dripping all over the floor." Mendoza saw the knife in Cano's right hand

4

as Cano got up after cutting Mendoza. It appeared to be the same knife Cano had purchased when Mendoza had gone with him to the surplus store. Mendoza, however, did not see the knife after that. He did not see it in Cano's hand as he was walking away and he did not see Cano put it in his pocket. Neither Mendoza nor his father was carrying any kind of weapon that night.

Cano, who had leaned over to cut Mendoza, stood up, turned around, walked over to Mendoza's father, who was still yelling, told him to "shut up" then hit him on the left side of his face with a closed fist. Accompanied by Rick, who had been standing behind Mendoza's father, Cano walked away across the parking lot.

After the commotion, a number of people came out of the church and gave Mendoza paper towels to use to attempt to stop the bleeding from the cut on his face. Police officers arrived and Mendoza told them Cano had cut him, then indicated Cano had been wearing black jeans and a white shirt with Nike written on it. An ambulance arrived and Mendoza was transported to the hospital where he received numerous stitches to close the cut on his face. The laceration extended from his hairline to his lip.

After the stitches came out, Mendoza had a scar on his face. In addition, at the time of trial, he still experienced blurriness in his left eye.

On the night of October 3, 2013, Culver City Police Department Patrol Officer Ryan Thompson was working as a training officer. While he and his partner, Officer Umutyan, were on patrol they received a call directing them to St. Augustine Church. The call indicated an assault with a deadly weapon had occurred there. As the officers approached the church, they looked for suspects. In particular, they looked for Cano. Thompson, who had previously had contacts with Cano, drove the approximate mile to the church with his lights and siren on. He, however, did not see Cano.

When Thompson and Umutyan arrived at the church, a Culver City Police Department sergeant, Van Hook, was already there. Thompson saw Louis Mendoza seated in his wheelchair near some blood stains. There was also an "L.A. City Fire Department [ambulance] . . . with Daniel Mendoza . . . in the back." Thompson had never before seen or known either of the Mendozas. Thompson took statements from

5

two women, Andreani and McCarte, who had seen Cano hit Louis Mendoza, then spoke with Louis, himself.  Louis was "pretty distraught.  He was concerned about his well being and the well being of his son, who was . . . being transported by the ambulance.  [Louis] appeared scared."  In addition, Louis Mendoza's right cheek was swollen underneath his eye.  Near Louis, Thompson saw what he considered to be stains from a "substantial amount of blood."

After speaking with Louis Mendoza, Thompson and his partner went to the hospital to see Daniel Mendoza.  Mendoza was lying in a hospital bed and one of the nurses pulled the gauze down to show the officers the wound on Mendoza's face.  Thompson was able to see a laceration which started just above Mendoza's left eye and continued down his cheek to just above his mouth.  When the officer spoke with Mendoza at the hospital, he did not appear to be under the influence of  alcohol or drugs.  Neither Daniel Mendoza, nor his father, Louis Mendoza, had been carrying any weapons when the officers first saw them at the church.  No weapons were found on Daniel Mendoza at the hospital.

Thompson and Umutyan then went back to the church and drove around the area.  They saw no one who matched Cano's or Rick's descriptions and, although they and several other officers searched the church grounds, the parking lot, the planters, a dumpster and all the trash receptacles, they found no weapons in the area.

On the morning of October 4, 2013, Culver City Police Officer Christopher Ferrier and his partner, Detective Brent Arnie, were in uniform and driving a marked car through the streets of Culver City.  At approximately 11:00 a.m., Ferrier saw Cano.  Ferrier recognized Cano because he had seen him on several prior occasions.  Cano, who Ferrier and Arnie were looking for because he allegedly had been involved in the assault which had occurred at St. Augustine Church the night before, was walking north on Sepulveda Boulevard.  Ferrier pulled his patrol car into a lane closer to Cano, who was with "another male Hispanic" named Orlando Ricky Garcia.  Cano looked in the officers' direction and said, " 'Hey, what's up guys[?]' "  Ferrier then turned his patrol car around and pulled up next to Cano and Garcia.  Both officers got out of their patrol car and

6

approached Cano. Cano looked at the officers and said, " 'Oh, c'mon guys, you know me. It's Chris.' " However, "based on the fact that [Cano] was a named suspect from [a] crime from the night before, [Ferrier] immediately placed him in handcuffs and made sure he didn't have any weapons." Garcia, too, was handcuffed and detained.

When Ferrier searched Cano, he found in Cano's pocket his wallet, which contained among other items a California identification card bearing the name Chris Cano. In addition, the officer recovered a receipt from a "surplus store." The receipt indicated Cano had purchased a "Humvee knife."

Jaime Naylor is the general manager of the surplus store. Naylor identified the receipt recovered from Cano's wallet as being from his store. The receipt had been printed on September 26, 2013 and showed Cano had purchased one "Humvee" folding knife and one T-shirt.

b. *Defense evidence.*

Orlando Ricky Carrera had known Cano for approximately two years. He had known Mendoza for approximately six months and was familiar with Mendoza's father, Louis Mendoza.

On the evening of October 3, 2013, Carrera had been with Cano at a bar drinking beer and watching a baseball game. After leaving the bar, Cano and Carrera were walking to Cano's house when they passed St. Augustine Church. There, they heard "loud noise[] and screaming." As it seemed the screaming was coming from the church parking lot, Cano and Carrera went inside. However, as soon as they entered the lot, the screaming stopped. There, Carrera observed Daniel Mendoza and Louis Mendoza as well as a number of other individuals standing nearby. When Carrera approached Louis Mendoza and asked him "what was going on," Louis Mendoza, who appeared to be intoxicated, "threw his arms up in the air and started screaming [and] yelling," " 'Call the police. Call the police.' " In the meantime, Cano was speaking with Daniel Mendoza, asking him if he was "picking on his father again." Carrera knew Mendoza and his father frequently argued. He also, however, believed that their disagreements never went beyond mere verbal fights.

7

At some point Carrera determined he wanted to leave. He told Cano he was "out of [there]," turned around, lit a cigarette and started to walk away. Cano, too, decided he wished to leave and he walked out of the parking lot with Carrera. As it was late and they did not wish to wake up Cano's mother, the two men decided to get a motel room for the night. At no time that evening did Carrera see Cano hit anyone, see Cano with a knife or see any blood.

Carrera indicated he has been on permanent disability for approximately three years and has no job. Although he testified he had been in Los Angeles for the previous three years, he had at one time told a detective he had moved to Los Angeles from Oklahoma within the prior six months. Most of Carrera's time is spent taking care of his mother. However, on October 3, he received his disability check and he decided to go to a bar with Cano. Carrera did not give money to Cano as Cano was on general relief and received money from both his mother and his girlfriend.

Carrera does not smoke marijuana and, at no time that evening did he ask Mendoza if Mendoza could get him some "pot" or "weed." He and Cano entered the church parking lot that night because they heard "[s]creaming [and] yelling" and decided to "check out what was going on."[2] As the two men got closer to the group in the parking lot, Carrera realized it was Mendoza and his father arguing. Because he has "respect for elder people [and the] disabled," Carrera approached Louis Mendoza and asked him what was wrong. Louis would not tell Carrera and, instead, just threw up his arms and told Carrera to " 'call the police.' "

While Carrera was attempting to talk with Louis Mendoza, Cano approached Daniel Mendoza. Cano was standing between the two men, as if he were protecting Louis from Daniel. There was, however, no "scuffle" and Carrera never saw any "physical[] fighting." He did not see anyone cut in the face and he never saw Cano hit

---

[2] Carrera had earlier told a detective he suffers from hypertension and did not like to be around "arguing and violence." Carrera indicated that, when he and Cano heard the yelling, he did not know anybody was arguing. He and Cano "were just curious" about what was happening.

Louis. As Louis would not tell him what was going on and no one appeared to be hurt or injured, Carrera told Cano he wished to leave the parking lot. He did not want to become involved in an argument. Cano, who had been screaming at Daniel, "nodded" at Carrera and began to walk in Carrera's direction. The two men then walked out of the parking lot and in the direction of Cano's apartment. However, on their way, Carrera decided it would be better to get a motel room.

2. *Procedural history.*

Following a preliminary hearing, an information filed November 8, 2013 charged defendant and appellant, Chris A. Cano, with one count of attempted second degree robbery (§§ 664, 211) (count 1), and one count of assault with a deadly weapon, a knife (§ 245, subd. (a)(1)) (count 2), during the commission of each of which he personally inflicted great bodily injury upon Daniel Mendoza (§ 12022.7, subd. (a)). In addition, it was alleged Cano committed misdemeanor battery (§ 242) (count 3).

A jury trial began on March 12, 2014. Before the jurors were brought into the courtroom, defense counsel made a motion pursuant to Evidence Code section 402 to exclude evidence of a receipt for the purchase of a knife found in Cano's wallet. The trial court, however, allowed the evidence as the general manager of the store from which the knife had been purchased had testified at trial. The manager authenticated the receipt and verified it had been for a "Humvee" folding knife.

During trial, it was brought to the court's attention that one of the jurors had been "texting" during a witness's testimony. After questioning the juror, and reminding her she had been instructed not to "text" during trial, the court determined, since she had only sent and received two texts and appeared not to have missed any of the testimony, her conduct would not affect her ability to deliberate in the matter and she would be allowed to remain on the panel.

After the prosecution presented its case, counsel for Cano made a motion to dismiss the matter pursuant to section 1118.1. The trial court denied the motion, indicating it believed there was substantial evidence in the record to support verdicts in

9

the case. The trial court indicated the evidence was "reasonable" and would, "upon review by an appellate court," support a verdict of conviction.

Following the presentation of evidence, instruction by the trial court and argument by counsel, on the afternoon of March 18, 2014, the jury found Cano not guilty of the crime of attempted second degree robbery in violation of sections 664 and 211, a felony as charged in count 1 of the information. With regard to count 2, the charge of assault with a deadly weapon, a knife, in violation of section 245, subdivision (a)(1), a felony, the jury found Cano guilty. In addition, the jury found the allegation Cano personally inflicted great bodily injury upon the victim in violation of section 12022.7, subdivision (a) during the commission of the assault to be true. As to count 3, the misdemeanor of battery in violation of section 242, the jury found Cano guilty.

Sentencing proceedings were held on April 2, 2014. The trial court indicated it had read the People's sentencing memorandum and the references and letters presented by Cano, then denied Cano probation. After noting the crime involved a "high degree of cruelty and callousness," that "the victim[, who was at the church with his wheelchair bound parent had been] vulnerable," that the "manner in which the crime was carried out showed planning," and that the crime was one of "increasing seriousness" with regard to Cano's criminal history, the trial court imposed the upper term of four years in prison for his conviction of assault with a deadly weapon. As to the infliction of great bodily injury during the assault, the trial court sentenced Cano to an additional three years in prison. For his conviction of the misdemeanor battery, in part because it was committed against a victim in a wheelchair, the trial court imposed a full consecutive term of six months, then noted the six months could be served in any penal institution. In total, the trial court sentenced Cano to a term of seven years six months.

The trial court awarded Cano presentence custody credit for 180 days actually served and 180 days of good time/work time, or 360 days. It then ordered him to pay a $280 restitution fine (§ 1202.4, subd. (b)), a stayed $280 parole revocation restitution fine (§ 1202.45), an $80 court operations assessment (§ 1465.8, subd. (a)(1)), and a $60 criminal conviction assessment (Gov. Code, § 70373).

Cano filed a timely notice of appeal on April 3, 2014.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed August 22, 2014, the clerk of this court advised Cano to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.

11